# UNITED STATES DISTRICT COURT

### for the

### Southern District of California



In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.
)
One Black Google Pixel 2 XL phone, model number )
G011C, with black case, currently located at 10385 Vista )
Sorrento Parkway, San Diego, CA 92121 )

**18MJ6296**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 371 | Conspiracy |
| 15 U.S.C. § § 78j(b), 78ff, and | Securities Fraud |
| 17 C.F.R. § 240.10b-5 | |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_John U. Roles_
*Applicant's signature*

**FBI SA John Roberts**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _12/14/18_

_Barbara L. Major_
*Judge's signature*

City and state:  San Diego, California       U.S. Magistrate Judge Barbara L. Major
*Printed name and title*

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, John W. Roberts, being duly sworn, do hereby depose and state as follows:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), assigned to the San Diego Division. I have been employed by the FBI as a SA since October 1999. I graduated from the College of the Holy Cross in 1995, with a degree in Accounting and Mathematics. From 1995 to 1999, I worked as a financial auditor at a major international accounting firm. During this time, I also received a license as a Certified Public Accountant in the Commonwealth of Massachusetts.

2. While working as a SA, I have conducted, or participated in, investigations of various violations of federal law, including white collar crime. Among other things, I have conducted, and assisted in, the execution of numerous arrest warrants, search warrants, and seizure warrants in investigations. Since June 2000, I have been assigned to squads responsible for investigating white collar offenses. The squad to which I am currently assigned specializes in investigating all forms of economic crime, including corporate, securities, financial institution, bank and investment fraud.

3. In the nearly nineteen years I have been assigned to investigate financial crimes, I have become experienced in investigations involving all types of economic crimes, including the methods and means employed by individuals who engage in these offenses. In addition to my personal investigative experience, I have consulted extensively with other experienced agents of the FBI, other federal agents and officers, and securities regulators who have expertise in investigations involving economic crime. I have attended training

courses covering the topics of fraud and white collar crime, and other types of criminal violations.

4.    The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents and records related to this investigation; recorded conversations with insiders; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search and seizure warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation

5.    This affidavit is made in support of an application to search the following cellular telephone:

a. A black Google Pixel 2 XL phone, model number G011C, with black case (hereinafter referred to as "SUBJECT TELEPHONE");

for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and securities fraud in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 occurring from January 1, 2016 through July 5, 2018.

6.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 371, and 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 have been committed by the user of the SUBJECT TELEPHONE. There is also probable cause to believe that a search of the SUBJECT

1 TELEPHONE (as more particularly described in Attachment A) will reveal
2 evidence of these crimes (as more particularly described in Attachment
3 B).

PROBABLE CAUSE SURROUNDING THE CRIMINAL CONDUCT

4

5 THE INDICTMENT IN THIS CASE

6   7.   On June 29, 2018, a federal grand jury sitting in the Southern
7 District of California handed down a sealed indictment against Gannon
8 Giguiere and Oliver Lindsay.  The indictment, which the Court has since
9 unsealed, charges Giguiere and Lindsay with conspiracy to commit
10 securities fraud in violation of 18 U.S.C. § 371, and securities fraud
11 in violation of 15 U.S.C. § § 78j(b), 78ff, and 17 C.F.R. § 240.10b-5.

12   8.   The indictment alleges a conspiracy to conduct two market
13 manipulation and pump-and-dump schemes.  One of those schemes involved
14 Giguiere's and Lindsay's manipulation of the stock of Kelvin Medical,
15 Inc., which began in or about October 2017, and continued until in or
16 about March 2018.  The second scheme involved Giguiere's manipulation
17 of the stock of Eco Science Solutions, Inc., which began in or about
18 January 2016, and continued until in or about January 2017.

19 BACKGROUND

20   Pump-and-Dump Schemes Generally

21   9.   Based on my training and experience, and from consultation
22 with other agents and securities regulators, I know that fraudulent
23 schemes surrounding the issuance, marketing, and trading of and in the
24 stock of small, thinly-capitalized (or "microcap") companies have been
25 widespread for years.  Although these frauds vary in their particulars,
26 in a typical scheme co-conspirators (1) secretly obtain control over a
27 small company that has shares of stock that can be publicly-traded, (2)
28 artificially inflate the price of the stock (the "pump") through

3

misleading corporate disclosures, call rooms, and stock promotion techniques (including, for example, penny stock newsletters and internet advertising), and (3) sell their stock into the rising market for significant profits (the "dump"). Stock prices almost invariably go down as a result of the dump, leaving innocent stockholders with significant losses.

10. There are many aspects to a successful manipulation scheme, including the following:

a. Reaching agreement on conspirator roles. Co-conspirators often play various roles in market manipulation schemes. This is driven by the development of particular competencies, and a desire to separate activities so regulators and law enforcement have a harder time linking all aspects of the scheme. Some people create, or obtain and clean up, a corporate shell that is suitable for manipulation. Others promote the stock through call rooms, internet pages, or penny stock newsletters. Still others hold the conspirators' shares that they will sell into the rising market and distribute the proceeds to the conspirators. All of these players are essential to a successful scheme, and co-conspirators sometimes reach an agreement on who covers what costs, and how much of the proceeds will go to which conspirators.

b. Controlling the company's outstanding shares. Manipulators are more successful when they control larger blocks of free trading shares. This allows them to impact the market price more easily, and decreases the chances that other market participants will place downward pressure on the stock price while the conspirators are trying to increase the price.

c. Using nominee accounts. Manipulators almost always control bank and brokerage accounts, but often hold those accounts in

the name of other individuals or entities.   This hides the fact that, e.g., those persons involved in the manipulation also manage and control significant aspects of the business, and persons selling stock into a rising market (the "dump") are also responsible for promotional efforts. Spreading out the shares among a larger number of nominee accounts also conceals that one person or group is responsible for most of the open-market activity in a stock, and facilitates manipulative trading in the stock.

        d.   <u>Press Releases and Corporate Developments.</u>   Stock manipulators are able to sell the majority of their shares at relatively high prices by getting innocent investors interested in the stock.   Co-conspirators often spend significant time developing an idea or product that the Company is supposedly pursuing.   They then cause the company to issue press releases.   These releases often have a nugget of truth that is exaggerated or presented in a misleading way.   Press releases are often issued in conjunction with efforts to promote the stock in other ways.

        e.   <u>Stock Promotion.</u>   Stocks are sometimes promoted through high-pressure call rooms, stock newsletters, and advertisements on finance websites.   The point of these efforts is the same as that of press releases - to get everyday investors interested in the stock, which will increase demand for the stock.   This has two salutary effects: the stock's price and volume increase, and the co-conspirators have enough people to whom to sell their stock at inflated prices.   Promotions often tout recent corporate disclosures as a reason to buy the stock.

        f.   <u>"Building the Chart."</u>   Co-conspirators commonly trade stock between two or more accounts that they control, and engage in other forms of manipulative trading.   Seeing a recent history of

increases in the price and volume of a given stock often incentivizes investors who have been exposed to promotions - investors who look up the stock chart on the internet can see upward trends that solidify their decision to invest in the company.

g. Controlled Stock Sales. Co-conspirators often seek steady, consistent and predictable movements in a stock's price and volume. They are able to get and keep investors interested in the stock if the price goes up steadily, as opposed to suddenly. This way, the conspirators can sell shares for longer periods of time, and ultimately sell more shares for higher prices, on average, than they can when there are dramatic swings in prices and volumes. Co-conspirators also seek to avoid sudden shifts because they would rather not attract the attention of regulators and law enforcement. Even during the promotional period, they also engage in manipulative trading to support the appearance of strong investor demand for the stock.

h. Distributing the fraudulent proceeds. One person or group of co-conspirators is often responsible for selling the conspirators' shares into the market. They then often transfer money through intermediary accounts, many of them offshore, when distributing the proceeds to the co-conspirators who were responsible for other aspects of the scheme, e.g., the company's management or the shell broker.

The Individuals and Entities Involved

11. Gannon Giguiere - Based on information obtained from social media websites, Giguiere has experience in information technology, having worked as Senior Director of Search at AltaVista, the internet search company. Based on his recorded statements, a review of the

6

website itself, and according to CHS,[1] Giguiere has operated a stock promotion website called TheMoneyStreet.com since at least as early as 2016.  Based on the evidence gathered in this case, some of which is discussed below, I believe Giguiere was involved in the manipulation of the stock of Kelvin Medical, Inc. (Ticker: KVMD, or "Kelvin Medical"), and Eco Science Solutions, Inc. (Ticker: ESSI, or "Eco Science Solutions"), among others.  The SUBJECT TELEPHONE was seized from Giguiere on July 5, 2018.

12.  CHS – CHS has admitted to investigators that he has been involved in penny stock fraud for many years, and has had contact with many other repeat players in the industry.  CHS states that, since at least as early as 2016, he was involved in the promotion of stocks through TheMoneyStreet.com.  CHS and his associate, Gannon Giguiere, paid for advertisements on websites like Yahoo Finance, where a click on the ad links to a TheMoneyStreet.com landing page touting a particular stock.  CHS is cooperating with the investigation, and has recorded conversations and captured evidence of written communications with Giguiere, Lindsay, and others regarding the manipulation of many stocks.

13.  Oliver Lindsay – According to U.S. law enforcement databases, Oliver Lindsay ("Lindsay") is a Canadian citizen.  According to CHS, and Lindsay's statements during recorded phone calls, Lindsay primarily resided in Georgetown, Cayman Islands before his arrest in this case.

---

[1] In August 2017, the United States charged CHS in a sealed complaint with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, for his role in a scheme relating to the 2012 manipulation Cuba Beverage Company. When approached by agents, CHS agreed to cooperate, the arrest warrant was not executed, and the complaint was later dismissed without prejudice.  CHS has entered into a cooperation agreement with the United States, has been advised that he will be charged for his role in the prior scheme at the conclusion of the investigation, and is cooperating in hopes that the United States will file a motion for downward departure under 18 U.S.C. § 3553 and/or § 5K1.1 of the Sentencing Guidelines.

1  Based on Lindsay's statements during recorded phone calls, Lindsay
2  operated an offshore brokerage firm known as CMGT Capital Management
3  ("CMGT").   Based on the evidence gathered in this case, much of which
4  is discussed below, I believe Lindsay was involved, along with Giguiere,
5  in the manipulation of the stock of Kelvin Medical, among others.

6      14.   According to its filings with the United States Securities and
7  Exchange Commission ("SEC"), Kelvin Medical was a Nevada Corporation
8  with its principal place of business in Nevada City, California, and
9  purported to be an "early participant in medical device and telehealth
10 wearables with a focus on the development of artificial intelligence
11 driven physical therapeutic technologies."

12     15.   According to its filings with the SEC, Eco Science Solutions,
13 Inc. was a Nevada corporation with its principal place of business in
14 Makawao, Hawaii.   According to its press releases and corporate
15 disclosures to the SEC, Eco Science Solutions purported to pursue several
16 business models over time; this included, in 2017, purporting to be "a
17 premier health, wellness and alternative medicines business by
18 effectively servicing and connecting wisely conscious consumers with
19 like-minded businesses."

20 THE MANIPULATION SCHEME REGARDING KELVIN MEDICAL, INC. STOCK

21     16.   According to CHS, and Giguiere's statements on recorded
22 telephone calls, attorney Sharon Mitchell, who was Kelvin Medical's
23 corporate counsel, contacted Giguiere about becoming involved with
24 Kelvin Medical, Inc.

25     17.   Based on Giguiere's recorded statements, Mitchell was unable
26 to collect on her legal fees from other individuals previously associated
27 with Kelvin Medical.   Mitchell then approached Giguiere, who agreed to

28

1  pay Mitchell's outstanding fees of $60,000 in order to obtain shares of

2  Kelvin Medical stock and access to the company's management.

3      Control over Kelvin Medical Stock

4      18.   According   to   brokerage   records   obtained   during   the

5  investigation, Phenix Ventures, LLC ("Phenix Ventures") purchased 1.5

6  million shares from an entity controlled by Mitchell, and deposited

7  these shares in a domestic brokerage account (the "Domestic Brokerage

8  Account").  According to Kelvin Medical's filings with the SEC, Giguiere

9  was the "Managing Member" of Phenix Ventures.

10     19.   According to Giguiere's and Lindsay's recorded statements,

11  and attachments to messages sent to and from these two individuals,

12  Giguiere arranged for a nominee entity to purchase a separate 1.5 million

13  shares from Mitchell.  According to brokerage records and Giguiere's and

14  Lindsay's   recorded   statements,   these   shares   were   maintained   in   an

15  entity's account at CMGT.  According to recorded statements made by

16  Giguiere and Lindsay, Lindsay managed and controlled trading activity

17  in this entity's account on behalf of Giguiere.

18     20.   According to Giguiere's recorded statements, he pursued other

19  ways by which he could own or control most of Kelvin Medical's free-

20  trading shares, including through additional purchases of stock directly

21  from Kelvin Medical, and purchases of shares from "friends and family"

22  of individuals previously associated with Kelvin Medical.

23     21.   During a recorded call on January 22, 2018 with Lindsay and

24  CHS, Giguiere stated that "the attorney wants me not to buy them [the

25  friends and family shares] in my name," so Giguiere wanted to purchase

26  those shares "somehow through CMGT, using, you know, cash that we've

27  created."  Lindsay responded: "We can do it tomorrow.  I have … a

28  corporation we can use that has an account.  It will be a fresh name and

everything." Giguiere then stated: "Sell a little bit of what you have on hand and just use that cash." Giguiere also stated that after his contemplated additional purchases of Kelvin Medical stock, he would own "100 percent of the balance" of the company's free trading stock.

22. On March 9, 2018, Lindsay sent a message stating, in part, "it would be great to see the DTC." Based on my training and experience, the phrase DTC refers to a list of a company's shareholders obtained from the Depository Trust Corporation, a securities clearinghouse. Giguiere responded: "Your universe owns all shares in the float."

"Building the Chart" through Manipulative Trading

23. Based on my training and experience, and discussions with securities regulators, I know that one type of manipulative trading involves matched trades. A matched trade is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of (a) creating a false or misleading appearance of active trading in any publicly traded security or (b) creating a false or misleading appearance with respect to the market for any such security.

24. Based on my training and experience, I believe that a number of statements made by the Giguiere and Lindsay show an intent to manipulate the price and volume of Kelvin Medical stock in late 2017 and early 2018 through matched trades.

25. On a November 27, 2017 recorded call with CHS, Giguiere made several references to manipulating Kelvin Medical stock. For example, Giguiere stated: "Now, if we have 1.5 million shares, well, we have three million shares to sell, well then that's, we can suck down a lot of traffic, right? … Because we can manage -- the nice thing about it is we can manage the price appreciation."

26.   On the same call, CHS asked Giguiere "where would you like to see it on the 27th." Based on other statements during the call, I believe this question refers to the planned promotion start date on December 27, 2017.  Giguiere responded "a dollar."  Giguiere also stated on the call: "We've got 2.9 million shares, um, that, you know, we'll be able to sell as we allow this thing to go from a dollar to let's say 2 dollars."

27.   On November 29, 2017, Giguiere stated in a message to Lindsay and CHS, "I have offers of $5,000 GTC ["good til close" orders] laddered in .10 increments up to 1.00 FYI. … so you guys can do your thing now as BMA is clear."

28.   In a November 30, 2017 text, CHS stated, in part: "ollie [Lindsay], Thanks for the KV[MD] support bids/buys today. I think and please G [Giguiere] chime in, it can just rest a few days."   Lindsay responded: "Yes.   I'm leaking the ticker to a few greedy people in a vague fashion.   Bids should be ther [sic].   But I agree w/ [CHS]." Giguiere added: "I suggest 1500 to 2000 shares a day in KV[MD] at .55 and I will just have a large offer there showing min, for the next 5 to 7 trading days.  let's let a week go by right here with a little volume and at this price. then we can move it."

29.   On December 5, 2017, Giguiere sent a message to Lindsay and CHS stating "I will move BMA [Giguiere's brokerage firm] to offer 3,000 at .75 …, meaning I will drop them to 3000 from 50000 … and then Ollie [Oliver Lindsay] can come in alongside them at .75."  He then stated "I will have BMA then move to .85 at 1000.  … So they can sell a touch up to 1.  … so will have them at .95 for 1000 and 1 for 1000."   Giguiere also explained the reason for these bids and offers: "so it moves in nickles [sic]."

30.   On and in many additional recorded calls and messages, Giguiere made statements similar to the foregoing that, based on my training and experience, represent an effort to coordinate trading and thereby increase the published price and trading volume of Kelvin Medical's stock.

31.   On December 8, 2017, Lindsay stated on a recorded call with CHS, "for some reason I'm a little bit, uh, hesitant about typing in all these details into this app. ... You can just imagine if it finds its way somewhere its fairly, ah, incriminating."

32.   On December 20, 2017, Lindsay stated on a recorded call with CHS: "You and I talked about this before. I just mentioned to Gannon that some of these text messages look just like really evil. I'd rather just pick up the phone."

33.   On a March 14, 2018 call with Giguiere, Lindsay and CHS, Lindsay stated "I don't like typing some of this, these details in so that's why I wanted to give a quick call." Giguiere replied: "No, I totally agree, calls are, are, better, not trackable."

Corporate Disclosures

34.   On or about August 1, 2016, Kelvin Medical submitted to the SEC a registration statement on Form S-1 that stated: "We are a Medical Device technology company that engages in the development, eventual production and sale of a hot cold treatment device." The device, according to the registration statement, was known as "Therm-N-Ice."

35.   On or about December 11, 2017, Giguiere participated on a recorded call with CHS. Giguiere stated: "If you look at their materials, and you look at their S-1, there's really nothing, okay. And when you ask management, there's really … there's kind of nothing there." CHS responded, in part, "so you're expanding his company .. and his

12

story." Giguiere replied: "Substantially….We're making the whole story up. I mean this guy's story is I can put on a heat pad and a cold pad at the same time. Not interesting."

36. Giguiere stated on a January 17, 2018 group chat with Lindsay and CHS that he "[s]ent out KV Framework doc they are preparing to file 8K on."

37. On or about January 18, 2017, Kelvin Medical submitted to the SEC a current report on SEC Form 8-K that stated "Kelvin Medical, Inc. is focused on developing and launching next generation telehealth wearable technologies, for tracking, diagnostics, and therapeutic delivery, that positively impact one's health and well-being. Our strategy not only focuses on those seeking to age gracefully and pain free through telehealth management, but also on the most competitive athlete working to maximize their bodily output. Our Company intends to leverage artificial intelligence and machine learning combined with the latest advancements in monitoring and therapeutic delivery technologies to increase the recovery and performance of the body."

38. On a January 18, 2018 call with CHS, Giguiere stated: "When, when this was presented to them [Kelvin Medical management] their jaws just hit the table 'cuz they're like 'I don't even know what you're talking about but it sounds great.'"

Promotional Activity

39. As previously discussed, CHS has reported that Giguiere manages and controls a website known as TheMoneyStreet.com, which promotes certain companies and their stocks. CHS states that he worked with Giguiere on several stock promotions on TheMoneyStreet.com, including the promotion of Kelvin Medical and Eco Science Solutions.

40.   On a recorded January 18, 2018 call with CHS, Giguiere stated that TheMoneyStreet.com's "landing page" for its promotion of Kelvin Medical was live, but "hidden".   According to Giguiere's recorded statements, and agents' review of TheMoneyStreet.com website, the landing page became accessible to the public beginning on or about January 29, 2018 through in or about March 2018.

41.   I am aware of evidence that Lindsay hired a phone room to promote Kelvin Medical stock.   In a December 18, 2017 message to CHS about trading in Kelvin Medical stock, Lindsay attributed some trades to a phone room.   "The bids this morning were phone room.   He'll do more tomorrow."

42.   According to popular financial websites, Kelvin Medical's stock price increased significantly during the period that Giguiere and Lindsay were involved in manipulative trading and promoting the stock. Its share price on November 29, 2017 was approximately $.22 per share. By March 20, 2018, the price was up to approximately $1.60 per share.

### False Statements to Securities Brokers

43.   On October 25, 2017, Giguiere represented to his securities broker in a "Rule 144 Seller's Representation Letter" that he "is not at present and has not been during the preceding three months, an officer, director, or 10% shareholder of the Company or in any other way an 'affiliate' of the Company."   Shortly thereafter, on November 1, 2017, Giguiere signed a questionnaire in which he answered "no" to the question "[d]oes the client [Giguiere] have any relationship with the issuer or its securities?"

### Sales of Kelvin Medical Stock

44.   According to brokerage records, Phenix Venture's domestic brokerage account obtained over $1.6 million from the sale of 1.5 million

shares of Kelvin Medical stock from on or about November 29, 2017 through on or about January 16, 2018.  Many of these sales were to Lindsay's clients.

45.  In a March 12, 2018 message to Lindsay and CHS, Giguiere stated: "as for the 1.5 [million shares] you have at CMGT, let's offload that as quickly as we can…3M [shares] more coming..so net net would like to get 1.5 [million] sold at 1.5 [dollars per share] and change and the 3m [shares] sold at 2.5 to 3 [per share]."  Lindsay replied "yes!!"

46.  Based on a review of brokerage records, from on or about December 8, 2017 through on or about March 15, 2018, Lindsay sold, or caused to be sold, approximately 263,000 shares of Kelvin Medical stock from the CMGT Accounts for gross proceeds of approximately $375,110.49.

The SEC's Suspension of Trading in Kelvin Medical Stock

47.  Based on information provided by the FBI, and the SEC's own analysis of the risks to investors who might transact in Kelvin Medical stock, the SEC suspended trading in the company's stock on March 20, 2018.

48.  Giguiere, Lindsay and CHS discussed what may have caused the suspension, and the ramifications, in many calls and messages, which began the same day they learned of the suspension.

49.  On a recorded March 20, 2018 with CHS, Giguiere speculated that the SEC reviewed Kelvin Medical's corporate disclosures and trading activity and concluded that the suspension was put in place because of several factors, including a significant increase in the company's stock price, and the lack of a product, employees, business or financing.

THE MANIPULATION SCHEME REGARDING ECO SCIENCE SOLUTIONS, INC. STOCK

50.  According to CHS, he and Giguiere were involved in an effort to manipulate the market for Eco Science Solutions; this effort was

similar in many respects to the Kelvin Medical scheme described above. The scheme regarding Eco Science Solutions took place before CHS began cooperating – therefore, the evidence concerning the scheme consists, in large part, on brokerage records, documents obtained from and an analysis performed by FINRA (the Financial Industry Regulatory Authority), a review of TheMoneyStreet.com, and statements by CHS during his debriefs with agents and regulatory personnel.

### Control over Eco Science Solutions Stock

51.  According to CHS, Mitchell proposed that CHS promote, or find promotion for, Eco Science Solutions stock. Mitchell supplied shareholder lists and information about the company's payables. CHS and Giguiere discussed Eco Science Solutions, and decided to promote the stock.

52.  According to CHS, Giguiere played the creative role by developing Eco Science Solutions' new business plan, working on press releases, and creating content for TheMoneyStreet.com's Eco Science Solutions promotion.

53.  Brokerage records show that CHS's wife (or then-fiancé) represented to the brokerage that an entity she controlled had obtained a $100,000 convertible note from Eco Science Solutions. CHS, through his wife, converted $3,900 of that note into 1.3 million shares of Eco Science Solutions stock on or about January 12, 2016.

54.  According to FINRA's analysis, CHS deposited 1 million of these shares into a brokerage account he controlled. According to FINRA's analysis and CHS, CHS also traded lesser quantities of Eco Science Solutions stock in nominee accounts (in the names of family members and a business associate of Giguiere's) to create the appearance of activity in the stock.

55. According to an SEC press release, the SEC initiated a subpoena enforcement action against CHS, i.e., an effort to force compliance with an investigative subpoena. According to CHS, around that time, CHS's brokerage firm suspended trading in his account, and FINRA questioned Eco Science Solutions management about whether they knew CHS or his wife.

56. According to CHS, in response to rising concerns regarding using CHS's name in connection with Eco Science Solutions, Giguiere sought to take custody of the Eco Science Solutions stock himself. Giguiere therefore obtained millions of shares pursuant to purported asset purchase and consulting agreements with Eco Science Solutions. Giguiere deposited these shares into his own accounts and sold them during the promotional period, as described below.

Press Releases and Corporate Disclosures

57. According to documents obtained from FINRA, Mitchell sent FINRA personnel an email describing the process by which Eco Science Solutions created and published its press releases. Mitchell represented that the "Executive Team determines what the Company is completing . … They then communicate the event to their Account Manager with [Separation Degrees], [a Separation Degrees] Copy Editor then creates a draft press release." An amended registration statement that Eco Science Solutions submitted to the SEC on SEC Form S-1 states that "Gannon Giguiere is the President of Separation Degrees – One, Inc. …"

58. Eco Science Solutions purportedly pursued several business lines from 2014 through 2017. According to an annual report that Eco Science Solutions filed with the SEC, and the company's corporate press releases:

a.    In 2014, the company was focused on what appears to have been an advanced spark plug, the "EcoFlora Plug, based on its 'Internal Pre-Combustion Chamber High Efficiency Spark Plug' technology, [which had] patent pending applications both in Canada and worldwide."

b.    In 2015, Eco Science Solutions purported to purchase from an entity controlled by CHS, "a certain technology application known as 'Stay Hydrated'" in exchange for 1,500,000 shares of Eco Science Solutions stock.  According to CHS, this was a sham transaction, and there was no real technology application associated with this product.

c.    In 2016, Eco Science Solutions claimed it "operate[d] Herbo and develop[ed] solutions that empower cannabis enthusiasts in their pursuit and enjoyment of their cannabis lifestyle."  Herbo was an app to facilitate the delivery of marijuana after an online purchase.

d.    In 2017, Eco Science Solutions claimed to be "a premier health, wellness and alternative medicines business by effectively servicing and connecting wisely conscious consumers with like-minded businesses."

e.    Also in 2017, Eco Science Solutions announced that it "will operate [a] Bank as a wholly-owned subsidiary of Eco Science Solutions, Inc. ESSI will own and operate a financial banking division providing payment processing, cash management and financial services to its customers in the cannabis industry."  The release also represented that Eco Science Solution had "expressions of interest, along with preliminary commitments to deposit sums between $300,000,000 and $600,000,000."

59.  The company also put out a number of press releases during each of the promotion periods at issue (discussed below).  Among them were announcements of a share buyback program, an issuance of shares to

18

Separation Degrees-One, Inc., the development of the Herbo app, its role as a sponsor for a cannabis conference to "create positive public awareness of medical marijuana," and the launch of Fitrix (which appears to be an app with some similarities to the popular Fitbit app.

Promotional Efforts

60.   According to documents obtained from FINRA, and investigators' review of the website, TheMoneyStreet.com promoted Eco Science Solutions and its stock from at least as early as February 2016 through at least in or about May 2016.

61.   According to popular financial websites, in the period before the promotions ran (December 1, 2015 through January 21, 2016), Eco Science Solutions' average daily volume was 1,225 shares, and its price was less than $.02 per share.   By January 2017, the price was up to $4.80 per share on average daily volume exceeding 800,000 shares.

False Statements to Securities Brokers

62.   When Separation Degrees-One, Inc. deposited shares in a brokerage account, Giguiere submitted a "Stock Promotion Affidavit" under his signature.   It represented that "I am not involved in any promotion activities whatsoever.   Third parties, of which I cannot control, will/may opine on what they choose on any security listed, on any exchange."

Sales of Eco Science Solutions Stock

63.   According to documents obtained from FINRA, Giguiere's accounts at two domestic brokerage firms sold over 5.8 million shares of Eco Science Solutions stock into the open market for over $8.5 million between July 5, 2016 and January 18, 2017.

PROBABLE CAUSE SURROUNDING THE SUBJECT TELEPHONE

64.   The SUBJECT TELEPHONE was seized from Giguiere by the FBI on July 5, 2018, at the time Giguiere was arrested pursuant to the indictment in this case.

65.   Giguiere (who lives in Orange County, California), Lindsay (who lived in the Cayman Islands), and CHS communicated frequently over the course of the Kelvin Medical scheme, and Giguiere and CHS did the same over the course of the Eco Science Solutions Scheme.   These communications included a significant volume of phone calls, emails, and text messages, including messages transmitted via encrypted messaging platforms, such as WhatsApp and Snapchat.

66.   Giguiere gave to CHS a specific phone number by which CHS could communicate with Giguiere.   CHS used this phone number to contact Giguiere throughout the manipulation schemes described above.   After the SUBJECT TELEPHONE was seized, the FBI called the number that Giguiere gave to CHS, and the SUBJECT TELEPHONE rang.

67.   On a recorded call, CHS asked Giguiere what devices he uses to communicate with CHS.   Giguiere stated he uses a Google Pixel phone for all of his communications, including SnapChat and WhatsApp, except he uses his computer for Skype calls with Lindsay and CHS, and uses both his computer and phone for communicating by email.   Giguiere also stated

his intention to obtain "black box phones" due to concerns about recent, highly publicized data breaches.

68. Based on training and experience, the encrypted apps Giguiere used to communicate with Lindsay and CHS are often used on a cell phone, and these apps are readily available in the relevant app stores.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

69. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such

1   acquisition, the examiner must inspect the device manually and record
2   the process and the results using digital photography. This process is
3   time and labor intensive and may take weeks or longer.

4       70.  Following the issuance of this warrant, investigators will
5   collect the subject cellular telephone and subject it to analysis. All
6   forensic analysis of the data contained within the telephone and its
7   memory card will employ search protocols directed exclusively to the
8   identification and extraction of data within the scope of this warrant.

9       71.  Based on the foregoing, identifying and extracting data
10  subject to seizure pursuant to this warrant may require a range of data
11  analysis techniques, including manual review, and, consequently, may
12  take weeks or months. The personnel conducting the identification and
13  extraction of data will complete the analysis within ninety (90) days,
14  absent further application to this court.

15  CONCLUSION

16      72.  Based on the foregoing, there is probable cause to believe
17  that the items identified in Attachment B have been used in the
18  commission of a crime and constitute evidence, fruits, and
19  instrumentalities of violations of conspiracy to commit securities fraud
20  in violation of 18 U.S.C. § 371, and securities fraud in violation of
21  15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5,

22  //
23  //
24  //
25  //
26  //
27  //
28  //

1  and will be found at the telephone to be searched as provided in
2  Attachment A.

3
4                          Special Agent John Roberts
5                          Federal Bureau of Investigation

6  Subscribed and sworn to before me this _14th_ day of December, 2018.
7
8
9                          HONORABLE BARBARA L. MAJOR
10                         UNITED STATES MAGISTRATE JUDGE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28